**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

OLIVER SAMUELS,

          Petitioner,

v.                                   Case No. 8:17-cv-1458-T-60TGW

SECRETARY, DEPARTMENT OF
CORRECTIONS,

          Respondent.

_____/

## ORDER DENYING PETITION

    Oliver Samuels petitions under 28 U.S.C. § 2254 for the writ of habeas corpus

(Doc. 1) and challenges his conviction for first degree premeditated murder.  Upon

review of the petition, both the response and the exhibits in support of the response

(Doc. 12; 13), and the reply (Doc. 22), the Court finds as follows:

### Factual and Procedural Background[1]

    Samuels was charged with the murder of Elfleter Bolden.  Samuels and Bolden

were dating.  Bolden was also dating another man named Romando Stutz.  Samuels

learned that Stutz was dating Bolden.  Samuels told Stutz that Stutz was seeing his

woman, he did not like that, and it was not going to be pretty if Stutz did not stop.

Stutz tried to break up with Bolden.  Bolden wanted to continue to see Stutz and so

they remained together for another two weeks.

---

[1] This summary of the facts derives from Samuels's brief on direct appeal (Respondent's Exhibit 5) and the parties' papers in this federal action.

During those two weeks Stutz saw Samuels.  Samuels stared at Stutz, turned his head away from Stutz when he approached, and appeared angry with him.  One evening around 12:00 A.M. Samuels called Stutz on the telephone.  Samuels told Stutz that he was not going to stand for any foolishness again.  Samuels threatened to kill Bolden and be done.  Samuels then laughed and said that he was joking.  Stutz told Samuels that he did not know about their serious relationship and did not want to be a part of it.

Bolden still wanted to see Stutz.  At 2:00 A.M., Bolden picked up Stutz from work.  The two went to his apartment and had sex.  Bolden then received a text message, got dressed quickly, and rushed out of the apartment.  Stutz was lying in bed when he heard screaming.  After he heard a car skid away, Stutz went outside and saw Bolden lying on the ground.

Neighbors heard sounds like glass or metal hitting concrete.  One neighbor saw Samuels standing over a woman striking her with a blunt object five or six times.  The neighbor saw Samuels then drive over the woman's head with a car.  The neighbor was 75 to 80 percent certain about her identification.  Another neighbor saw a car drive over something and go back and forth several times before driving off.  A third neighbor saw a man striking toward the ground.  A police officer arrived at the scene and saw tire tracks across Bolden's body, which was surrounded by lots of blood.  An autopsy showed that Bolden died from blunt trauma.

A detective arrested Samuels.  After waiving his constitutional rights, Samuels admitted to hitting Bolden three times with a baseball bat after she kicked him.

Samuels had suspected that Bolden was with Stutz.  Samuels left town and got rid of the bat.  Samuels denied running Bolden over with his car.

At trial the defense conceded that Samuels killed Bolden but claimed that he did so in the heat of passion — not with premeditation.  The jury rejected the defense and found Samuels guilty as charged.  The state appellate court affirmed the conviction and sentence.  Samuels filed a motion for post-conviction relief in state court, which was denied the motion without an evidentiary hearing and affirmed on appeal.  Samuels then filed his federal habeas petition in this case.

### Exhaustion and Procedural Default

The Respondent correctly argues that Ground Eight and Ground Nine are procedurally barred from federal review because Samuels failed to exhaust Ground Eight and the state court denied Ground Nine on independent and adequate state procedural grounds.  (Doc. 12 at 3–4, 20–21).  A petitioner must exhaust the remedies available in state court before a federal court can grant relief on federal habeas.  28 U.S.C. § 2254(b)(1)(A).  The petitioner must fairly present the federal claim to the state court to give the state court an opportunity to review and correct any alleged violation of federal rights.  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  The petitioner must alert the state court to the federal nature of his claim, *Picard v. Connor*, 404 U.S. 270, 278 (1971), and also give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process, *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

A federal court may stay — or dismiss without prejudice — a habeas case to allow a petitioner to return to state court to exhaust a claim.  *Rhines v. Weber*, 544

U.S. 269 (2005); *Rose v. Lundy*, 455 U.S. 509 (1982).  The federal court need not do so and should deny the claim as procedurally defaulted if the state court would deny the claim as procedurally barred under state law.  *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).

Also, a federal habeas court will not review a federal claim if the state court denied the claim on independent and adequate state procedural grounds.  *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991).  The last state court reviewing the federal claim must clearly and expressly state that its judgment rests on the state procedural bar.  *Harris v. Reed*, 489 U.S. 255, 263 (1989).  If the last state court rejected the federal claim in an unexplained decision, the federal habeas court looks through the unexplained decision to the last reasoned order to rule on the claim.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).  If the last reasoned order imposed a state procedural bar, the federal court presumes that the later unexplained decision did not silently disregard the bar and consider the merits.  *Id.*

A petitioner may excuse a procedural default on federal habeas by showing cause for the default and actual prejudice from the alleged violation of federal law.  *Maples v. Thomas*, 565 U.S. 266, 280 (2012).  A petitioner may also excuse the default by demonstrating a miscarriage of justice — or that he is actually innocent.  *House v. Bell*, 547 U.S. 518, 536–37 (2006).  The burden is on the petitioner to show either.  *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 537.

**Ground Eight:**

Samuels asserts that trial counsel was ineffective for failing to object to an "intentional manslaughter by act" instruction.  (Doc. 1 at 17–18).  Samuels raised the

federal claim in his amended post-conviction motion, (Respondent's Exhibit 11 at 21), but did not raise the claim in his brief on appeal, (Respondent's Exhibit 15).[2]  Because Samuels failed to invoke one complete round of the state's established appellate review process, *Hunt v. Comm., Ala. Dep't Corrs.*, 666 F.3d 708, 730 (11th Cir. 2012), Ground Eight is unexhausted.

If Samuels returned to state court to exhaust the federal claim, the state court would dismiss a new post-conviction motion with the unexhausted claim as untimely. Fla. R. Crim. P. 3.850(b).  Returning to state court to exhaust the claim would be futile.  The ground is procedurally defaulted.  *Jimenez v. Fla. Dep't Corrs.*, 481 F.3d 1337, 1342 (11th Cir. 2007).  Because Samuels fails to show that either cause and prejudice or a miscarriage of justice excuses the procedural default, *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 537, Ground Eight is procedurally barred from federal review.

**Ground Nine, Sub-claim A:**

Samuels raises two claims in Ground Nine.  Samuels asserts that his conviction and sentence are illegal because police unlawfully obtained statements from him, ("Sub-claim A"); (Doc. 1 at 18–22), and because trial counsel was ineffective for failing to move to suppress those statements ("Sub-claim B"); (Doc. 1 at 18–22).[3]

Both in his post-conviction motion and his brief on appeal, Samuels raised sub-claim A.  (Respondent's Exhibit 11 at 21–22); (Respondent's Exhibit 15 at 19–20).  The

---

[2] On appeal, Samuels did raise other ineffective assistance of counsel claims related to jury instructions.  None of those other claims referred to the "intentional manslaughter by act" instruction. (Respondent's Exhibit 15 at 16–19).

[3] Because sub-claim B is the identical to the claim in ground five, the claims are addressed in together.

state appellate court affirmed the order denying sub-claim A in an unelaborated

decision.  (Respondent's Exhibit 16).  Looking through that unelaborated decision to

the trial court's order, the trial court denied the ground for the following reasons:

> In his second ground, Defendant attacks his conviction by claiming it was
> obtained through the use of illegally obtained statements.  Specifically, he
> argues that he was essentially tricked into confessing to a murder.  Since this
> claim should have been raised on direct appeal, *see Johnson v. State*,
> 921 So. 2d 490, 505 (Fla. 2005) (holding that issues regarding the admission
> of involuntary statements made to law enforcement should have been raised
> on direct appeal), Defendant's second ground is dismissed.  *See*
> *Teffeteller v. Dugger*, 734 So. 2d 1009, 1016 (Fla. 1999) (dismissing, as
> procedurally barred, claims that should have been raised on direct appeal).

(Respondent's Exhibit 12 at 6).

The state court clearly and expressly denied sub-claim A on state procedural

grounds.  The state procedural bar is both independent and adequate.  Fla. R. Crim. P.

3.850(c) ("This rule does not authorize relief based on grounds that could have or

should have been raised at trial and, if properly preserved, on direct appeal of the

judgment and sentence."); *Waldrop v. Jones*, 77 F.3d 1308, 1314 (11th Cir. 1996).  The

Court presumes that the state appellate court did not silently disregard the bar.

Because Samuels again fails to show that either cause and prejudice or a miscarriage

of justice excuses the procedural default, *Maples*, 565 U.S. at 280; *House*, 547 U.S. at

537, sub-claim A is procedurally barred from federal review.

### Legal Standard

### A.    AEDPA

Because Samuels filed his petition after the enactment of the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA"), AEDPA governs the review of his

remaining claims.  *Lindh v. Murphy*, 521 U.S. 320, 336–37 (1997).  AEDPA created a

highly deferential standard for federal court review of a state court adjudication.

AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000) interpreted this "new constraint" on the power of the federal habeas court to grant a state prisoner's petition:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"[C]learly established Federal law" encompasses only the holdings of the Supreme Court at the time of the relevant state court decision.  *Id.* at 412.

"The focus . . . is on whether the state court's application of clearly established law is objectively unreasonable . . ." *Bell v. Cone*, 535 U.S. 685, 694 (2002).  An unreasonable application is "different from an incorrect one." *Id.*  Even clear error is not enough.  *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017).  A federal habeas

petitioner must show that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). "This is 'meant to be' a difficult standard to meet." *LeBlanc*, 137 S. Ct. at 1728 (quoting *Richter*, 562 U.S. at 102).

A state-court factual determination is not unreasonable "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). If "'[r]easonable minds reviewing the record might disagree'" about the state court's finding, the federal habeas court cannot supplant the determination. *Id.* at 301 (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)). A federal habeas court may grant relief only if "in light of the evidence presented in the state court proceedings, no reasonable jurist would agree with the factual determinations upon which the state court decision is based." *Raleigh v. Sec'y, Fla. Dep't Corrs.*, 827 F.3d 938, 948–49 (11th Cir. 2016).

In addition to this deference to factual findings under AEDPA, a state court's factual determinations are also presumed correct on federal habeas. 28 U.S.C. § 2254(e)(1). A petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The purpose of federal review is not to re-try the state case. "[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell*, 535 U.S. at 694. A federal court must afford due deference to a state court's decision. "AEDPA prevents defendants — and

federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). For that reason, review of the state court decision is limited to the record that was before the state court. *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011); *see also Landers v. Warden, Att'y Gen. of Ala.*, 776 F.3d 1288, 1294–95 (11th Cir. 2015) (applying *Pinholster* to section 2254(d)(2)).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons in the opinion and defers to those reasons if reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). When the last state court decision is without reasons, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Id.* at 1192.

The unexplained decision by the last state court is still the decision that is owed deference under AEDPA. *Marshall v. Sec'y, Fla. Dep't Corrs.*, 828 F.3d 1277, 1285 (11th Cir. 2016). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99.

## B.   Ineffective Assistance of Counsel

Samuels claims ineffective assistance of counsel — a difficult claim to sustain. "'[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between.'" *Waters v. Thomas*,

46 F.3d 1506, 1511 (11th Cir. 1995) (en banc) (quoting *Rogers v. Zant*, 13 F.3d 386, 386

(11th Cir. 1994)).  *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998) explains:

> The law regarding ineffective assistance of counsel claims is well settled and
> well documented.  In *Strickland v. Washington*, [466 U.S. 668] (1984), the
> Supreme Court set forth a two-part test for analyzing ineffective assistance of
> counsel claims.  According to *Strickland*,
>
> > First, the defendant must show that counsel's
> > performance was deficient. This requires showing that
> > counsel made errors so serious that counsel was not
> > functioning as the "counsel" guaranteed the defendant
> > by the Sixth Amendment.  Second, the defendant must
> > show that the deficient performance prejudiced the
> > defense. This requires showing that counsel's errors
> > were so serious as to deprive the defendant of a fair
> > trial, a trial whose result is reliable.

The post-conviction court is "free to dispose of ineffective assistance claims on either of

its two grounds." *Sims*, 155 F.3d at 1305.  "There is no reason for a court deciding an

ineffective assistance of counsel claim . . . to address both components of the inquiry if

the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

"[C]ounsel is strongly presumed to have rendered adequate assistance and made

all significant decisions in the exercise of reasonable professional judgment."

*Strickland*, 466 U.S. at 690.  "[A] court deciding an actual ineffectiveness claim must

judge the reasonableness of counsel's challenged conduct on the facts of the particular

case, viewed as of the time of counsel's conduct." *Id.*  *Strickland* requires that "in light

of all the circumstances, the identified acts or omissions were outside the wide range

of professionally competent assistance." *Id.*

"An error by counsel, even if professionally unreasonable, does not warrant

setting aside the judgment of a criminal proceeding if the error had no effect on the

judgment." *Strickland*, 466 U.S. at 691.  To meet this burden, the defendant must

show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.* at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690–91. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. The burden is much higher:

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at trial could have acted, in the circumstances, as defense counsel acted at trial . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992); *see also Jones v. Barnes*, 463 U.S. 745, 751 (1983) (confirming that counsel does not have a duty to raise a frivolous claim).

Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019). "[I]t is rarer still for merit to be found in a claim that challenges a strategic decision of counsel." *Id.*

## Analysis

### A.      Federal Claims Before and During Trial

### Ground One:

Samuels asserts that his due process rights were violated when the trial court denied his motion for mistrial and unreasonably applied *Wainwright v. Witt*, 469 U.S. 412 (1985) and *Hunter v. Moore*, 304 F.3d 1066 (11th Cir. 2002).  (Doc. 1 at 5–6).

#### Procedural History

During closing trial counsel argued that the opinion by the "Government's" accident reconstruction expert was not consistent with eyewitness testimony and was not based on any evidence.  (Respondent's Exhibit 2 at 786, 789).  Trial counsel repeated that the expert was a "Government employee."  (*Id*. at 789, 790).  Trial counsel repeated again that the accident reconstruction expert had access to any of the "Government's witnesses."  (*Id*. at 789).  In response to this repeated reference to the "Government," a juror blurted out to trial counsel, "Who are you employed by?"  (*Id*. at 790).  The trial court immediately responded, "Sir, please don't interrupt the closings." (*Id*. at 790).  At a sidebar conference, trial counsel moved for a mistrial based on the juror's comment.  (*Id*. at 789–90).

The trial court denied the mistrial motion for the following reasons (Respondent's Exhibit 2 at 791–92, 808–10):

> Okay.  I'm denying the motion for mistrial.  I mean, [the juror] is clearly responding to the Defense's repeated statements about Government actors involved in this case and pointing out how essentially every State witness is a Government actor in this case.  And he has made a statement during the closings, ["]Who do you work for?["]  I instructed him not to say anything.  He hasn't said anything else.  I don't think that rises to a level of a mistrial.  I also don't think there's a basis for removing him based on that.  If you want to request some sort of instruction that I give to the jury, I will consider it.

> But I think when I said, ["]Sir, don't interrupt the closings,["] he said
> ["]okay["] and nodded.  And I don't think he would interrupt again, but if you
> want me to give an instruction, I will consider one.

Trial counsel argued that the juror was highly partial by suggesting that trial counsel's employer would impact his comments on the credibility of witnesses. (Respondent's Exhibit 2 at 792).  The trial prosecutor responded — and the trial court agreed — that the juror was entitled to have that opinion and could share that opinion during deliberations.  (*Id.* at 792–93).  The trial court further explained (*Id.* at 793):

> And he is entitled to his opinions about closing arguments on both sides.
> Should he be blurting something out in closings?  No.  Does what he said rise
> to the [level] of granting a mistrial?  No.  Not unless you have some case law
> to support that.  I have not seen any supporting that.  I don't think it rises to
> that level.  And I instructed him not to say anything.  He has responded and
> appears to be in favor with it.  If you want me to give any other type of
> instruction, I will consider a request.  If not, then we need to move on.

Trial counsel represented that the juror had been rolling his eyes, was not listening, seemed distracted, jumped up, was upset, and got angry and suggested that the trial court could instruct the jurors to listen to closing argument.  (*Id.* at 793–94).  The trial court responded (*Id.* at 794):

> Well, I don't think there is any evidence to suggest he is not listening.  He
> has had his eyes open the whole time.  He's got his notepad out.  I've been
> watching the jury the entire time to make sure that everyone is awake,
> paying attention.  They have all got their notepads.  No one is falling asleep.
> They all appear to be listening.  And there is no reason to think he's not
> listening.  Clearly he's listening.  Otherwise, he wouldn't be saying
> something.
>
> So if you — I mean, there's no reason for me to instruct them to listen.  Do
> you want me to say, ["]Please don't comment during the closing arguments[,"]
> or something else?  ["]It's inappropriate to comment during the closing
> arguments.["]

Trial counsel declined the offer, renewed his request for a mistrial and removal of the juror, and argued that nothing could cure what happened.  (*Id.* at 795).

- 13 -

At trial counsel's request, the trial court asked the juror what he meant by his comment.  (Respondent's Exhibit 2 at 810–11, 814).  The juror responded that "he did not know what he meant by it."  (*Id.* at 814).  The juror clarified, "But it was just meant to be a comment that you just keep hearing this stuff coming to you, and you just want to make a comment back."  (*Id.* at 814–15).  The juror confirmed that he still had an open mind and could be fair and impartial.  (*Id.* at 815).  The trial court offered the defense an opportunity to ask any other questions.  (*Id.* at 815).  Outside the presence of the juror, trial counsel argued that the tone and manner of the juror's comment suggested that he had done his own research and already made up his mind about the verdict.  (*Id.* at 816).  The trial court concluded that nothing suggested that the juror had done any research and the juror's comment was a logical response to trial counsel's comments in closing.  (*Id.* at 818–20).

### Analysis

The claim is not cognizable on federal habeas.  Whether a mistrial should be granted is an issue of state law.  Under state law, a mistrial should be granted for juror misconduct only "when an error is so prejudicial as to vitiate the entire trial." *Tai A. Pham v. State*, 70 So. 3d 485, 493 (Fla. 2011) (citations omitted).  A federal habeas court can only provide relief for violations of federal law.  28 U.S.C. § 2254(a).  Samuels cannot circumvent this limitation by couching his state law claim in terms of "due process." *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Carrizales v. Wainwright*, 699 F.2d 1053, 1054–55 (11th Cir. 1983).

Even if the claim is cognizable, Samuels cannot meet his heavy burden under AEDPA.  Samuels claims that the state court unreasonably applied *Wainwright v.*

*Witt*, 469 U.S. 412 (1985) and *Hunter v. Moore*, 304 F.3d 1066 (11th Cir. 2002).  (Doc. 1 at 5–6).  *Hunter* is an opinion by the Eleventh Circuit.  Even though it is binding on this Court, only Supreme Court opinions can clearly establish federal law under AEDPA.  28 U.S.C. § 2254(d)(1); *Lopez v. Smith*, 574 U.S. 1, 2 (2014).

Also, both *Hunter* and *Witt* address different questions of law.  *Hunter* addresses whether the defendant had been denied counsel at a critical stage of a bench trial when the judge announced a verdict immediately after the close of evidence and without offering the parties closing argument.  *Hunter*, 304 F.3d at 1066.  *Witt* addresses whether prospective jurors had been improperly excluded because of their opposition to capital punishment in a death penalty case.  *Witt*, 469 U.S. at 415–18.  The state court in this case addressed whether a mistrial was necessary because of the juror's comment in closing.  Neither opinion applies.  *Walker v. Hadi*, 611 F.3d 720, 723 (11th Cir. 2010).

The remedy for a claim of juror partiality is a hearing in which the defense has the opportunity to prove actual bias.  *Smith v. Phillips*, 455 U.S. 209, 215, 217 (1982). The trial court held a hearing, asked the juror questions, and provided trial counsel an opportunity to ask questions and prove bias.  (Respondent's Exhibit 2 at 811–15).  The trial court reasonably applied relevant federal precedent.  *Crawford v. Head*, 311 F.3d 1288, 1333–34 (11th Cir. 2002).

Samuels also asserts that the state court unreasonably determined facts.  (Doc. 1 at 5); 28 U.S.C. § 2254(d)(2).  In his reply, Samuels relies on trial counsel's rendition of the events presented during argument by the parties.  Trial counsel claimed that the juror was rolling his eyes, was not listening, seemed distracted, and was upset and

angered.  (Doc. 22 at 3) (quoting Respondent's Exhibit 2 at 794).  Based on her own observations, the trial judge found to the contrary.  The trial judge found that there was no evidence to suggest that the juror was not listening.  (Respondent's Exhibit 2 at 794).  After questioning the juror, the trial judge also concluded that the juror was going to keep an open mind and be fair and impartial.  (*Id.* at 814–15, 818–21).  These findings are presumed correct on federal habeas.  28 U.S.C. § 2254(e)(1); *Witt*, 469 U.S. at 429.  Trial counsel's proffer to the trial court is not clear and convincing evidence that rebuts those findings.  Ground One is denied.

**Ground Two:**

Samuels asserts that police unlawfully obtained statements from him in violation of his federal constitutional rights and the state court unreasonably applied *Miranda v. Arizona*, 384 U.S. 436 (1966).  (Doc. 1 at 9).

**Procedural History**

Before trial Samuels filed a motion to suppress his statements to police after his arrest.  (Respondent's Exhibit 18).  After a hearing on the motion, the trial court denied the claim in a lengthy oral ruling with findings of fact and application of law to those facts.  (Respondent's Exhibit 19 at 105–21).  At the hearing, the evidence showed that Samuels was arrested in Miami on a warrant for first degree murder.  (*Id.* at 105–06).  Detective Gibson and Detective Tower with Saint Petersburg Police drove to Miami to arrest Samuels and Detective Gibson told Samuels that he was under arrest for murder when he was taken into custody.  (*Id.* at 105–06).  Samuels was placed in a room at the police department in Miami where Detective Gibson and Detective Tower interrogated him.  (*Id.* at 106–07).  The detectives recorded most of the interrogation.

(*Id.* at 107).  At the hearing, the detectives testified about their initial discussion with Samuels about his rights.  (*Id.* at 107).  That initial discussion was not recorded.  (*Id.* at 107).  The trial court found that the testimony by the detectives about that initial discussion was "credible and reliable."  (*Id.* at 107).

Detective Tower read Samuels a form that advised him of his rights. (Respondent's Exhibit 19 at 108).  The detective asked Samuels background information and memorialized his responses on the form.  (*Id.* at 108–09).  The detective asked Samuels whether he understood his constitutional rights and memorialized his affirmative responses on the form.  (*Id.* at 109–11).  The detective then asked Samuels, "Having these rights in mind, do you wish to talk to us now?" (*Id.* at 110).  The detective asked Samuels to read the question out loud to make sure that he could read.  (*Id.* at 110).  Samuels did so and then wrote down on the form, "No." (*Id.* at 110).  Samuels placed his initials on the form next to his answer.  (*Id.* at 110–11).

Samuels did not say anything else or ask for a lawyer.  (Respondent's Exhibit 19 at 108).  The detective asked Samuels why he wrote the word "no" on the form.  (*Id.* at 111).  Samuels replied that he did not want to talk about it.  (*Id.* at 111).  Both detectives then got up, gathered their things, and said that they were going to leave. (*Id.* at 111).  Detective Gibson told Samuels that he was under arrest for first degree murder.  (*Id.* at 111).  The detective had already done so when Samuels was initially arrested.  (*Id.* at 111).  The detectives did not further question Samuels and intended to leave.  (*Id.* at 111–12).  Samuels then reinitiated the conversation by telling the detectives, "I want to talk to you."  (*Id.* at 112).

Detective Tower told Samuels that, if he wanted to speak, he needed to clarify that on the form. (Respondent's Exhibit 19 at 113). The detective gave Samuels the form and a pen. (*Id.* at 113). Samuels scratched out the word "no," wrote the word "yes," and then signed the form. (*Id.* at 113). The detectives then began to interrogate Samuels. (*Id.* at 113–14). During the recorded interrogation, Samuels appeared relaxed and cooperative. (*Id.* at 115). Samuels never asked for a lawyer. (*Id.* at 114). After the interview, Samuels signed a consent form for a DNA sample. (*Id.* at 115). Samuels also agreed to be photographed and provide clothing. (*Id.* at 115).

After reciting relevant rules of law, the trial court applied those findings of fact to that law and determined as follows (Respondent's Exhibit 19 at 118–21):

> So having reviewed all of that, the Court has already found that the defendant invoked his right to remain silent during a custodial interrogation.
>
> And moving on from that, the Court has already also found that once the suspect invoked his right to remain silent, the police have to refrain from any words or actions other than those normally attendant to arrest and custody that the police should know are reasonably likely to elicit an incriminating response from the suspect.
>
> And on that I've already found, but I'll say again more clearly, that Detectives Gibson — Detective Gibson's statement to the defendant, "Why did you write no," is specifically not a word or action or statement that would be reasonably likely to elicit an incriminating response from the suspect but, rather, something normally attendant to arrest and custody.
>
> And normally attendant to arrest and custody can be interpreted as many different things. What the Court is focusing on is that that is not a statement that would be reasonably likely to elicit an incriminating response from the suspect.
>
> And, specifically, they're not asking him anything related to their investigation. They're not asking him anything related to the homicide. And in the *Hunt* opinion on page 5 where the Court is referring to the lower court's written order that the appellate court had disagreed with, it talks about the lower court's order finding that the detective may have set the stage, but there was no evidence that they specifically initiated conversations referencing the homicide.

And the *Hunt* opinion talks about what types of statements would constitute things reasonably likely to elicit an incriminating response from a suspect, referring specifically to going back to questions relating the homicide investigation.

So this type of question, the simple "what do you mean by that," meaning your written "no," is not anything like saying, "Did you run her over?  What did you do with the bat?  How many times did you hit her?  Where did you park the car?  Was the car on?" those types of things that, of course, would fall into the category of things likely to elicit an incriminating response from the suspect.

And so for those reasons, that's why the Court is specifically finding that that one statement by Gibson does not fall into that category.  And so, therefore, the analysis can continue for the Court to determine whether the suspect's right was scrupulously honored.

And then as I've already said, the analysis requires the Court to determine who initiated the — reinitiated the contact, and I'm finding that there was no interrogation.  They never began the interrogation.  They were done.  They were leaving when the defendant said to them he wanted to talk to them.

So, clearly, it's the defendant who's getting their attention to say to them, ["]Don't leave.["]  And I'm paraphrasing, but this is what his statements to them created.  It's preventing them from leaving.  It's keeping them there when they would have left.  It's getting them to sit down when they were standing up.  And it's him saying to them, I want to talk to you, not the other way around, and that's clear.

And so the analysis does not require going through the factors that the Court would consider if the police reinitiated because they didn't.  Rather, because the defendant reinitiated the dialogue, the inquiry is whether his decision to change his mind and waive his rights by speaking to them was voluntary, knowing and intelligent.  And I'm finding that it is all of those things:  Voluntary, knowing and intelligent.

He got their attention.  He had every opportunity to be done with this.  They were leaving.  He took the pen from Detective Tower.  He crossed out "no" that he had written.  He wrote down "yes" to change his answer on the Rights Advisement Form.

According to the testimony, he then signed the form.  His signature is on it.  And he then participated in the interview.  He was not under the influence.  He can read and write.  He[,] on the video[,] is depicting a demeanor that this is voluntary, that he's doing this of his own free will, that he's made an intelligent decision.

And based on the totality of the circumstances, that's the Court's finding.  And, therefore, his rights were scrupulously honored by the detective.  This is

not a case where he invoked his right to an attorney.  And I believe based on the *Hunt* case the Court's analysis legally has reached its conclusion.

Those are all of the things that the Court is required to determine under the circumstances presented here.  And so having considered all of that and the evidence that's been presented and the applicable law, the motion to suppress, therefore, is denied.

### Analysis

The state court identified the correct principles in *Miranda* and correctly applied those principles to the evidence at the suppression hearing.  (Respondent's Exhibit 19 at 115–21).  *Miranda* held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  *Miranda*, 384 U.S. at 444.  Before any questioning, the defendant must be informed that he has the right to remain silent, any statement can be used as evidence against him, and he has the right to have a retained or appointed attorney present.  *Id.* at 444–45.  If the defendant indicates in any manner that he does not wish to be interrogated, police may not question him.  *Id.* at 445.  Police must "scrupulously honor[ ]" a defendant's "right to cut off questioning." *Michigan v. Mosley*, 423 U.S. 96, 104 (1975).

When Samuels invoked his right to silence, the detectives "scrupulously honor[ed]" his "right to cut off questioning" and ceased any further questioning. *Mosley*, 423 U.S. at 104.  The detective only asked Samuels why he wrote the word "no" on the form.  The question served only to clarify whether Samuels in fact wanted to invoke his right to silence.  *Delap v. Dugger*, 890 F.2d 285, 290 (11th Cir. 1989), *abrogated on other grounds by Fry v. Pliler*, 551 U.S. 112, 119–20 (2007); *see also*

*Medina v. Singletary*, 59 F.3d 1095, 1104–05 (11th Cir. 1995) (declining to adopt a *per se* rule that "no" can never be ambiguous or equivocal).

As he started to leave, the detective again advised Samuels of the charge against him.  The repeated statement was not reasonably likely to elicit an incriminating response and did not amount to unlawful interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 302 (1980) (defining interrogation under *Miranda* as "express questioning" or "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect"); *Berry v. Warden, S. Ohio Corr. Facility*, 872 F.3d 329, 333 (6th Cir. 2017) ("Officer Kuntz's inquiry about whether Berry was aware of the charges against him fell within the realm of routine 'incidents of the custodial relationship.'" (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983)).

When the detectives were about to leave, Samuels reinitiated communication which allowed the detectives to further question Samuels.  *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981) (holding that police must not further question a suspect who invokes his *Miranda* rights "unless the accused himself initiates further communication, exchanges, or conversations with the police").  The state court correctly analyzed the totality of the circumstances to conclude that Samuels knowingly and intelligently waived his rights.  *Id.* at 486 n.9.  This Court also independently concludes that the detectives complied with the federal constitution when they obtained statements from Samuels.  *Land v. Allen*, 573 F.3d 1211, 1217 (11th Cir. 2009) (requiring a federal court, as a first step under AEDPA, to

"independently ascertain and apply Federal law to determine whether the challenged statement was obtained in accordance with the Constitution").

Samuels argues that the detectives never advised him of his constitutional rights a second time.  (Doc. 1 at 7).  The failure to readminister *Miranda* warnings after a suspect reinitiates communication is not fatal.  *Jacobs v. Singletary*, 952 F.2d 1282, 1295 (11th Cir. 1992).  Besides, the detectives had just presented Samuels with a *Miranda* rights form, which listed all of his rights, and read and reviewed those with him before he invoked his right to silence.  Shortly after, when Samuels reinitiated communication, the detectives presented Samuels with the same *Miranda* rights form.  Samuels corrected his answer on the form and signed the form, indicating that he knowingly and intelligently waived his rights.

Samuels also claims that the state court unreasonably determined facts. (Doc. 1 at 9); 28 U.S.C. § 2254(d)(2).  Samuels alleges that he was coerced with "unfulfilled promises" and was forced to scratch off the word "no" on the form and replace it with "yes."  (Doc. 1 at 7).  Samuels alleges that the detectives' testimony at the hearing was sometimes equivocal and that the two detectives remembered a "slightly different" version of events.  (Doc. 1 at 8).  The detectives did testify about what occurred when the recording equipment was turned off.  (Respondent's Exhibit 19 at 11–16, 34–42).  The trial court heard any equivocation in that testimony but still concluded that it was "credible and reliable."  (*Id.* at 107).  This Court defers to that credibility determination.  *Nejad v. Att'y Gen., State of Ga.*, 830 F.3d 1280, 1292 (11th Cir. 2016).  Also, if Samuels remembers a different version of events, the time to present that version of events was in state court during the hearing with sworn

testimony.  Samuels did not testify.  Samuels fails to rebut the trial court's findings

with clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Ground Two is denied.

## Ground Three:

Samuels asserts his due process rights were violated because the evidence at

trial was insufficient to prove premeditation for first degree murder and only proved

that he committed the murder in the heat of passion.  (Doc. 1 at 9–10).[4]  At the end of

trial, trial counsel moved for judgment of acquittal for the same reasons.

(Respondent's Exhibit 2 at 704–10).  The trial court denied the motion with the

following oral explanation (Respondent's Exhibit 2 at 710–15):

> [P]ursuant to the jury instructions for murder in the first degree and since
> the issue here in dispute is killing with premeditation, the definition of
> killing with premeditation, according to the jury instructions, is killing after
> consciously deciding to do so.  The decision must be present in the mind at
> the time of the killing.  The law does not fix the exact period of time that
> must pass between the formation of the premeditated intent to kill and the
> killing.  The period of time must be long enough to allow reflection by the
> defendant.  The premeditated intent to kill must be formed before the
> killing . . . .
>
> In viewing the evidence in the light most favorable to the State, I will just
> address element number three because one and two have already been
> established, and they're not in dispute.  But we've had testimony from a
> number of witnesses.  In particular witness number four called by the State,
> Yyana Fowles, an independent eyewitness living at the apartment complex,
> The Reserve, which is the location of the crime, she heard voices.  She went to
> the window, and this is just the pertinent part of her testimony as to
> premeditation.
>
> She saw at the window a dark car back out and then drive over something.
> She saw the car go back and forth three or four times over the object, which
> at the time she didn't know was a human being.  And then she testified that
> the vehicle went all the way over, then over again, then drove out of the
> apartment complex.  And she testified the driving was very calm and

---

[4] Samuels further asserts that the state court unreasonably applied *In re Winship*, 397 U.S. 358,
359 (1970), which addressed whether the "beyond a reasonable doubt" standard applies to juvenile
adjudicatory proceedings for acts which would be crimes if committed by an adult.  (Doc. 1 at 10).
Samuels did not commit the crime as a juvenile and was not adjudicated delinquent as a juvenile.
*In re Winship* is inapplicable.  *Walker*, 611 F.3d at 723.

controlled driving and deliberate driving, and those were quotes from her testimony.

In addition to that were other eyewitnesses at the scene, individuals who lived at The Reserve apartment complex who looked out their windows. What was consistent among the witnesses was the noise of a cracking of the bat against an object. They didn't realize it was against Ms. Bolden's head at the time. But it was described as sounding like metal hitting concrete, an incredibly loud bang. And all of the witnesses testified as to hearing a noise to that effect.

Additionally, there was testimony as to the driving by witness number six, Dolly Moultrie, that she initially heard a bump and a yell. She saw a woman getting attacked. She saw the defendant standing over her and kept going, repeatedly striking her. She saw the victim on the ground. She said the defendant was striking her with an object while the victim was on the ground. The defendant then threw the object into the car. The defendant then got into the car, pulled out in the car that had to make a wide turn to get towards the white truck and made a parallel park right on to her head, meaning the victim, for approximately 15 seconds and then pulled out.

Those are some of the pertinent points of eyewitness testimony that established premeditation in this case. All of that testimony indicates a conscious intent to kill, consciously deciding to kill this individual, particularly driving back and forth over someone three or four times, calmly, deliberately, after having beaten them repeatedly with a baseball bat. The time that it takes to go from beating with the baseball bat to taking the baseball bat to the vehicle, putting it in the vehicle, getting in the vehicle, and driving and having to drive out of the way to actually run the vehicle over the victim clearly shows a conscious intent to kill.

Additionally, the time that it would take to go from approaching her at her vehicle to talk to her with no object in his hand, getting kicked by the victim at the doorway of her vehicle, and then making the decision at that point to go back to his own vehicle, walking, open the door, get a baseball bat out, walk back over, and make the decision to start beating her repeatedly about the body and head with the baseball bat and then stop and then go back to the car, throw the bat in, get in the car, drive out of the way to run over her at least two times, possibly three, before leaving all demonstrate a continued, violent attack and a conscious intent to kill.

In addition to all of that, at approximately 11:00 P.M. the night before the early morning hours of this incident, which occurred at approximately 3:00 A.M. on April 18th, at 11:00 P.M. the night right before that, in a phone call with Romando Stutz the defendant stated to Romando Stutz in part that he wasn't going to do anything to him. If there was anybody that he did anything to, it would be her. And he stated he had been hurt before, and he wasn't going to go through it again. That also indicates his premeditated, conscious intent to kill. And, in fact, he did kill her within five hours of that statement.

- 24 -

There's been expert testimony, testimony from the medical examiner, cause of death, blunt force trauma.  The combined trauma of an object striking the victim and a car, the combination of object and car is the blunt force trauma that killed the victim, although each type of injury was sufficient to kill the victim.

There's been testimony from expert witness accident reconstructionist, Michael Jockers, who testified in his opinion that the victim was run over at least twice, possibly three times by the defendant.

There is the defendant's own admission that he beat the victim with the bat, and then he denies and, in fact, says he — he denies running over her, says he actually left driving away in the opposite direction which is contrary and rebutted by every eyewitness.  And then there is DNA blood evidence of the victim in the transmission pan area of the vehicle that is discovered when the vehicle is impounded in Miami.

So taken in the light most favorable to the State, there is a *prima facie* case of premeditation and all of the elements for first degree murder.  So the motion for judgment of acquittal is denied.

To comply with due process, a criminal conviction must be supported by "evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979).  A trial court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 318–19.  The claim is governed by the substantive elements of a crime as defined by state law. *Id.* at 324 n.16.  If evidence supports conflicting inferences, the jury is presumed to have resolved any conflict in favor of the prosecution. *Id.* at 325.

Under AEDPA, a due process claim based on the sufficiency of evidence is reviewed with two layers of deference. *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). A federal habeas court defers first to the jury's responsibility to decide what reasonable inferences should be drawn from the evidence, *id.* at 655, and second to the

state court's ruling that rejects the sufficiency challenge, *id.* at 651.  To violate due process, the jury's finding must be "so insupportable as to fall below the threshold of bare rationality."  *Id.* at 656.

The state court reviewed the definition of premeditation under state law, viewed the evidence in the light most favorable to the State, and concluded that there was *prima facie* evidence of premeditation.  (Respondent's Exhibit 2 at 710–15).  Considering the circumstances leading up to the murder, including the death threat and how the deadly wounds were inflicted, the state court's ruling was not unreasonable.  *Lanzafame v. State*, 751 So. 2d 628, 630 (Fla. 4th DCA 1999).  The jury's finding of guilt did not fall below that "threshold of bare rationality."  *Coleman*, 566 U.S. at 656.

Samuels argues that the evidence proved that he "acted in a reactive state" and in "an act of passion as opposed to reflection when the victim was struck by the vehicle."  (Doc. 1 at 9).  Even if this inference was reasonable, a reasonable inference could also have been fairly inferred that Samuels killed Bolden with premeditation.  The state court correctly resolved any conflicting inferences in favor of the prosecution.  *Jackson*, 443 U.S. at 325.  Ground Three is denied.

**B.**      **Federal Claims on Post-Conviction**

**Ground Four:**

Samuels asserts that trial counsel was ineffective for failing to file a notice of expiration of speedy trial and a motion for discharge.  (Doc. 1 at 10).  Samuels argues that competent counsel would have asserted his speedy trial rights under state rules of criminal procedure.  (Doc. 1 at 10).  The post-conviction court denied the claim for

the following reasons (Respondent's Exhibit 12 at 3–4) (state court's record citations

omitted):

> In his first sub-claim, Defendant argues that Counsel was ineffective in
> failing to "timely file Notice of Expiration of Speedy Trial Time." "[A] claim of
> ineffective assistance of counsel based on a failure to assert a movant's
> speedy trial rights under rule 3.191 requires a movant to show that trial
> counsel made an unreasonable decision not to pursue a movant's speedy trial
> rights and that trial counsel's unreasonable decision prejudiced the movant."
> *Remak v. State*, 142 So. 3d 3, 6 (Fla. 2d DCA 2014), *reh'g denied*
> (July 21, 2014), *review denied*, 153 So. 3d 908 (Fla. 2014).  Here, Defendant's
> claim is facially deficient; however, the record refutes the notion that he will
> be able to establish prejudice.  Accordingly, this ground is denied.
>
> In order to raise a facially sufficient allegation of prejudice, a movant must
> either "allege specific facts that demonstrate that the State could not have
> brought the movant to trial within the recapture window provided in rule
> 3.191(p)(3) or demonstrate that the quality of the State's evidence would have
> diminished if the State had been forced to proceed within the fifteen-day
> recapture window."  *Id.*  Here, Defendant's motion fails to allege either point
> with sufficient specificity.  As such, his argument is facially insufficient.
> *See id.* (noting that the absence of an argument containing a *prima facie*
> basis for finding prejudice renders insufficient a claim alleging ineffective
> assistance based on a speedy trial violation).
>
> Despite the insufficiency of Defendant's argument, this Court will not permit
> him to amend because the record conclusively refutes the allegations raised
> therein.  While motions deemed facially insufficient are frequently struck
> with leave to amend, trial courts are not required to allow amendments to
> arguments that are conclusively refuted by the record.  *Spera v. State*,
> 971 So. 3d 754, 762 (Fla. 2007).  In this instance, the record conclusively
> refutes the notion that counsel was deficient in failing to file [a] notice of the
> expiration of the speedy trial timeframe.
>
> Here, the record indicates that Defendant waived his speedy trial rights
> during a hearing on June 28, 2010.  As such, counsel cannot be deemed
> ineffective for failing to attempt to assert these rights later.  Moreover,
> counsel may waive a client's right to a speedy trial even if the client objects.
> *See Randall v. State*, 938 So. 2d 542, 544 (Fla. 1st DCA 2006).  Thus,
> Defendant's opposition to the waiver of his own speedy trial rights would not
> alone serve as the basis for a claim of ineffective assistance of counsel.
>
> Furthermore, even if the Court were to consider the possibility that counsel
> was deficient in failing to assert Defendant's speedy trial rights after having
> previously waived them, the record refutes the notion that Defendant was
> prejudiced.  Here, Defendant not only confessed to the crime, but DNA
> evidence also linked him to it.  In view of this, the Court finds that the record

conclusively refutes Defendant's assertion that he was prejudiced by counsel's failure to asset his speedy trial rights.

Samuels raises a *Strickland* claim that turns on a question of state law. *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1299 (11th Cir. 2017). Samuels asserts that trial counsel was ineffective for failing to assert his speedy trial rights under a state rule of procedure — not the federal constitution. (Doc. 1 at 10) (citing Fla. R. Crim. P. 3.191); (Respondent's Exhibit 11 at 4–5) (referring to the 175-day period in Fla. R. Crim. P. 3.191(a)). The state court concluded that Samuels failed to adequately allege prejudice in support of the claim rooted in state law. (Respondent's Exhibit 12 at 3–4) (citing *Remak*, 142 So. 3d 3 at 6). This Court defers to the state court on this state law issue. *Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005). Because Samuels failed to adequately allege prejudice, the state court did not unreasonably deny the *Strickland* claim. *Borden v. Allen*, 646 F.3d 785, 822 (11th Cir. 2011) ("To grant habeas here would be to open the door to habeas relief for any petitioner who files a boilerplate, unspecific petition for collateral relief. We are convinced that Supreme Court precedent would not support such an approach."). Ground Four is denied.

## Ground Five and Ground Nine, Sub-claim B:

Samuels asserts that trial counsel was ineffective for not moving to suppress his statements to police because the statements were "unlawfully induced upon unfulfilled promises of Law Enforcement." (Doc. 1 at 11–12, 18–22).[5] The post-conviction court denied the claim for the following reasons (Respondent's Exhibit 12 at 4–5):

---

[5] Samuels asserts this claim in both Ground Five and Ground Nine.

In his second sub-claim, Defendant argues that his attorney rendered ineffective assistance in failing to file a motion to suppress his confession based upon the fact that his statements were made in response to lies told by the police. Defendant further asserts that such a motion would have likely have been granted. As such, he concludes that he would not have been convicted but for this deficiency in counsel's performance.

Defendant's second sub-claim is denied because counsel was not deficient as asserted therein. Defendant's argument hinges upon his belief that a motion to suppress his statements to police would have been granted if counsel had argued that the statements were obtained through police dishonesty. Specifically, Defendant argues that police convinced him to talk by telling him that he "would not be charged at the top" if he cooperated. Therefore, he concludes that his waiver of his Fifth Amendment rights was not voluntary.

However, since factual misrepresentations by law enforcement officers are generally permissible in eliciting confessions, Defendant's counsel was not deficient for failing to include this argument in [the] motion to suppress. *State v. Pitts*, 936 So. 2d 1111, 1132 (Fla. 2d DCA 2006) (quoting *State v. Mallory*, 670 So. 2d 103, 106 (Fla. 1st DCA 1996)); *Baptiste v. State*, 40 Fla. L. Weekly D2617 (Fla. 1st DCA Nov. 24, 2015) ("misrepresentation[s] of fact . . . are not enough to render a suspect's ensuing confession involuntary, nor does it undermine the waiver of the defendant's *Miranda* rights."). While legal misrepresentations that cloud a suspect's awareness of his rights and the consequences of a waiver are not permitted, no such facts are alleged here. *See Pitts*, 936 So. 2d 1131–32 (noting that a "waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.").

In view of the above, Defendant's counsel was not deficient for failing to raise the argument described in this sub-claim. An attorney's assistance is not rendered deficient through his failure to raise a frivolous point. *Cf. Teffeteller v. Dugger*, 734 So. 2d 1009, 1020 (Fla. 1999) ("Counsel cannot be deemed ineffective for failing to prevail on a meritless issue."). As such, Defendant's second sub-claim is denied.

Samuels moved for rehearing, (Respondent's Exhibit 13), and the

post-conviction court clarified its ruling (Respondent's Exhibit 14 at 1–2) (state court

record citations omitted):

As an initial matter, trial counsel did raise the issue of improper police coercion with regard to the police discussing the possibility of charging Defendant "with the very top of the line" unless he cooperated with them. As such, the record refutes Defendant's claim that counsel was deficient for failing to raise this argument.

Moreover, even if Defendant's counsel had not raised the argument that the police unlawfully coerced Defendant's cooperation through promises of leniency, the record refutes the notion that such a failure would have constituted a performance deficiency.  An attorney's assistance is not rendered deficient through his failure to raise a frivolous point.  [*Cf.*] *Teffeteller v. Dugger*, 734 So. 2d 1009, 1020 (Fla. 1999) ("Counsel cannot be deemed ineffective for failing to prevail on a meritless issue.").  The evidence presented at the January 3, 2010 hearing on Defendant's Motion to Suppress refutes the notion that Defendant's cooperation was the product of police coercion.  Thus, Defendant's counsel would not have been deficient in failing to argue that Defendant's confessions were elicited through coercive promises of leniency.

During the suppression hearing, Detective Gibson testified that he never made any promises to Defendant about what would happen if Defendant cooperated.  Additionally, Detective Tower testified that the officers did not try to use any undue influence to obtain the answers they wanted and that they did not indicate that Defendant could get a deal.  Detective Tower further explained that his discussion about the different types of homicide pertained to the element of premeditation and only occurred after Defendant had already confessed to the crime.  This testimony was directly supported by the audio from the relevant interrogation, during which Defendant states that he had not been threatened or promised anything to elicit his cooperation.  The recording of the interrogation further refutes Defendant's argument because it is clear that, consistent with Detective Tower's aforementioned testimony, the discussion of the varying degrees of murder was not a coercive technique aimed at garnering Defendant's cooperation.  Rather, it seems clear that the conversation sought to determine the level of premeditation involved in the crime.  On cross-examination, Defendant's attorney questioned Detective Tower with regard to his discussion of the degrees of murder.  Detective Tower's responses were consistent with his testimony on direct examination and with the recording of the interrogation.  As such, the record undermines the assertion that Defendant was promised leniency in exchange for his cooperation.

Samuels does not come forward with clear and convincing evidence to rebut the state court's finding that the detectives did not promise him leniency in exchange for his cooperation.  28 U.S.C. § 2254(e)(1); *Miller v. Fenton*, 474 U.S. 104, 112, 116–17 (1985).  Because the detectives did not promise him leniency, Samuels voluntarily waived his rights and trial counsel could not have been ineffective for failing to file a meritless motion.  *Pinkney*, 876 F.3d at 1297; *Land*, 573 F.3d at 1217–18.

In his reply, Samuels cites portions of the state court record to try to rebut that finding.  (Doc. 22 at 13–14).  Samuels points out that the detective told him during the interview: "For us to be able to do anything for you or to make a proper decision on how this handles — **just like he said**, there's a different degrees and different levels." (Respondent's Exhibit 19 at 67) (emphasis added).  Samuels argues that this comment shows that the detectives had discussed with him about what they could do for him if he cooperated before the recording equipment was turned on.  (Doc. 22 at 14).

The detective's statement does not tend to show that the detectives promised him anything.  The statement at most infers that one of the detectives previously discussed "different degrees and different levels" with Samuels.  The statement is not clear and convincing evidence that rebuts the state court's finding.  28 U.S.C. § 2254(e)(2); *Nejad*, 830 F.3d at 1289 ("Clear and convincing evidence is a 'demanding but not insatiable' standard, requiring proof that a claim is highly probable." (quoting *Ward v. Hall*, 592 F.3d 1144, 1177 (11th Cir. 2010)).

The state court also rejected Samuels's argument because, (Respondent's Exhibit 19 at 53), during the recorded interview Samuels denied that the detectives had threatened or promised him anything when he changed his mind and, (*Id.* at 19, 43), at the suppression hearing both detectives denied that they promised Samuels anything.  The detectives testified that they only discussed the different degrees of homicide to inform Samuels — not coerce him.  (*Id.* at 43, 79, 81, 85).  On this record, Samuels fails to show that "no reasonable jurist would agree with the factual determinations upon which the state court decision is based." *Raleigh*, 827 F.3d at 948–49.  Ground Five and Ground Nine, sub-claim B are denied.

**Ground Six:**

Samuels asserts that trial counsel was ineffective for failing to object to the trial court's use of short form jury instructions for homicide, excusable homicide, and manslaughter by act. (Doc. 1 at 15–16). The post-conviction court denied this claim for the following reasons (Respondent's Exhibit 12 at 5) (state court record citations omitted):

> In his third sub-claim, Defendant argues that trial counsel failed to object to the introduction of the "short form jury instructions" on homicide and manslaughter by act. He argues that the "short form" instructions are misleading because it could be construed to suggest that a killing could never be excusable nor committed in the heat of passion, if committed with a dangerous weapon. He further claims that counsel failed to request a "long form" jury instruction. Defendant contends that if counsel had objected to the "short form" jury instructions and asked for the "long form" jury instruction on excusable homicide, there is a likelihood that he would have been found guilty of manslaughter rather than murder in the first degree.
>
> Defendant's third sub-claim is devoid of merit and is, therefore, denied. The record reflects that the instructions given to the jury track Florida's standard jury instructions. As such, defense counsel was not deficient for failing to object to the instructions. *See Jones v. State*, 845 So. 2d 55, 72 (Fla. 2003) (finding that counsel could not be ineffective for failing to object to instructions that conformed to the approved standard jury instructions). In consequence, Defendant's claim fails to satisfy *Strickland*. Accordingly, his third sub-claim is denied.

Samuels raised a *Strickland* claim that turns on a question of state law. *Pinkney*, 876 F.3d at 1295. Whether the jury instructions were incorrect is an issue of state law. *Jones v. Kemp*, 794 F.2d 1536, 1540 (11th Cir. 1986). This Court defers to the state court's conclusion that the instructions were proper. *Parker v. Sec'y, Fla. Dep't Corrs.*, 555 F. App'x 870, 873–75 (11th Cir. 2014). Because any objection to the instructions would have been overruled, trial counsel was not ineffective for not raising the meritless objection. *Pinkney*, 876 F.3d at 1297.

The state court record confirms that the trial court gave the jury an excusable homicide instruction that tracked the standard instruction. (Respondent's Exhibit 2 at 835–36, 840–42); Fla. Std. Jury Instr. (Crim.) 7.1 (2013); Fla. Std. Jury Instr. (Crim.) 7.7 (2013). The "long form" and "short form" jury instructions for excusable homicide were replaced with a single instruction years before Samuels's trial. *Standard Jury Instructions-Criminal Cases No. 92-1*, 603 So. 2d 1175 (Fla. 1992).

The trial court also granted the defense's request for a separate special heat-of-passion instruction. That special instruction was read twice to the jury and did not mention the dangerous weapon exception at all. (Respondent's Exhibit 2 at 721–72, 837–38, 839–40) (citing *Palmore v. State*, 838 So. 2d 1222 (Fla. 1st DCA 2003)). The state court did not unreasonably conclude that the instructions were not confusing or misleading under state law. Ground Six is denied.

## Ground Seven:

Samuels asserts that trial counsel was ineffective for failing to ask for a lesser included offense instruction for vehicular homicide. (Doc. 1 at 16). The post-conviction court denied the claim for the following reasons (Respondent's Exhibit 12 at 5–6) (state court record citations omitted):

> In his fourth sub-claim, Defendant argues that Counsel was ineffective for failing to request jury instructions on vehicular homicide. He argues that if counsel had requested an instruction on vehicular homicide, it is likely that the jury would have found him guilty of that crime rather than first degree murder.
>
> Even if Defendant's counsel was deficient in failing to request instructions on vehicular homicide, Defendant was not prejudiced. In this case, the jury convicted Defendant of first degree murder as charged. As such, in order for Defendant to prevail, this Court would have to accept his contention that the jury – if instructed on vehicular homicide – probably would have ignored its

own findings and the Court's instructions.  However, defendants are not entitled to the benefit of such speculation.  *Strickland*, 466 U.S. at 694–95.

Thus, this Court cannot assume that the jury would have disregarded its findings in order to grant Defendant a jury pardon.  Rather, this Court must assume that the jury would have acted according to law.  *Id.*  In view of this, Defendant's fourth sub-claim must be denied.  *See State v. Young*, 932 So. 2d 1278 (Fla. 2d DCA 2006) (holding that trial counsel's failure to request an instruction on a lesser-included offense did not prejudice the defendant where the jury found the defendant guilty of every element of the greater offense).

The state court correctly concluded that it could not speculate that the jury would have found Samuels guilty of the lesser included offense.  *Strickland*, 466 U.S. at 694–95 ("An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like.  A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed.").  The jury would have also been instructed: "If you return a verdict of guilty, it should be for the highest offense which has been proven beyond a reasonable doubt."  (Respondent's Exhibit 2 at 849).  The jury found Samuels guilty of first degree murder beyond a reasonable doubt.  The evidence supported that conviction.  The jury would not have found Samuels guilty of any lesser offense.  *Magnotti v. Sec'y, Dep't Corrs.*, 222 F. App'x 934, 940 (11th Cir. 2007); *Harris v. Crosby*, 151 F. App'x 736, 738 (11th Cir. 2005).  Ground Seven is denied.

## Ground Ten:

Samuels asserts that the trial court lacked subject matter jurisdiction over the case because he was not issued a uniform traffic citation.  (Doc. 1 at 22–24).  The post-conviction court denied this claim for the following reasons (Respondent's Exhibit 12 at 6) (state court record citations omitted):

In his third ground, Defendant argues that the trial court lacked jurisdiction to hear this case because he was not issued a uniform traffic citation. This argument is utterly frivolous. As such it is denied. Defendant was charged with committing first degree murder in Pinellas County. As such, this Court had jurisdiction over his case. *See* § 26.012, Fla. Stat. Ann. (providing that the circuit court has jurisdiction over felony matters).

The claim is not cognizable on federal habeas. Whether the state court had jurisdiction over the case is an issue of state law. A federal court can only grant relief on federal habeas for violations of federal law. 28 U.S.C. § 2254(a). Even if the state court did not have jurisdiction under state law, this Court could not grant Samuels relief. *Tejada v. Dugger*, 941 F.2d 1551, 1560 (11th Cir. 1991).

Even if the claim was cognizable, the state court concluded that it did have jurisdiction under state law. This Court defers to the state court on that state law issue. *Chandler v. Armontrout*, 940 F.2d 363, 366 (8th Cir. 1991) ("The state court considered the issue of jurisdiction in Chandler's post-conviction proceeding and determined that the trial court had jurisdiction to accept Chandler's guilty plea. . . This determination of jurisdiction is binding on this court."). Ground Ten is denied.

## Evidentiary Hearing

Samuels requests an evidentiary hearing. The burden is on Samuels to demonstrate the need for an evidentiary hearing. *Jones v. Sec'y, Fla. Dep't Corrs.*, 834 F.3d 1299, 1318–19 (11th Cir. 2016). Samuels fails to meet his burden and the state court record refutes his federal habeas claims and precludes relief. Accordingly, his request for an evidentiary hearing is **DENIED**. *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).

## Conclusion

Because Samuels fails to meet his heavy burden under AEDPA, his petition for the writ of habeas corpus (Doc. 1) is **DENIED**.  The clerk must enter a judgment against Samuels and **CLOSE** the case.

## Denial of Certificate of Appealability and
## Leave to Appeal *In Forma Pauperis*

A prisoner seeking a writ of habeas corpus is not absolutely entitled to appeal a district court's denial of his application.  Rather, a district court must first issue a certificate of appealability ("COA").  A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Because Samuels fails to show that reasonable jurists would debate either the merits of the underlying claims or the procedural issues that he seeks to raise, he is not entitled to a COA or leave to appeal *in forma pauperis*.  *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).  A certificate of appealability is **DENIED**. Leave to appeal *in forma pauperis* is **DENIED**.  Samuels must obtain permission from the circuit court to appeal *in forma pauperis*.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this <u>13th</u> day of August, 2020.

_____
**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**